UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV**     **5261**

------------------------------------------------------------X

DEBRA GOODMAN

**COMPLAINT**

Plaintiff,     **JURY TRIAL DEMANDED**

-against-



THE CITY OF NEW YORK, POLICE OFFICER
STEVEN RODRIGUEZ,  shield no. 28141, POLICE
OFFICERS JOHN DOE and RICHARD ROE and other
unidentified members of the New York City Police
Department

Defendants.

------------------------------------------------------------X

## PRELIMINARY STATEMENT   JUDGE McMAHON

1.      This civil rights action challenges the constitutionality of the New York

City Police Department's ("NYPD") policy, practice and custom of interfering with the right of

individuals to film, photograph, videotape, or record (collectively, "record") NYPD members

performing their official duties in public places. In particular, this lawsuit challenges retaliatory

measures taken by NYPD officers against the Plaintiff, Debra Goodman, for attempting to record

police officers and Emergency Medical Services ("EMS") personnel who were interacting with a

homeless woman on the sidewalk on the Upper West Side of Manhattan.

2.      Individuals have the right to record the public activities of police officers,

and such recording helps to ensure the police remain accountable to the public.  The NYPD's

widespread policy, practice and custom of arresting, threatening to arrest or otherwise interfering

with individuals who attempt to record police performing their official duties infringes on

individuals' First Amendment rights.

1

3.      Defendants' policies, practices, customs and actions violate Ms. Goodman's rights under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States, Article I, Section 8 of the New York Constitution, and common law.  Ms. Goodman seeks monetary damages, a declaratory judgment and injunctive relief.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the Constitution of the United States. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) as this is a civil action arising under the Constitution of the United States and the laws of the United States.  This Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction over the supplemental claims arising under New York State law pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper for the United Stated District Court for the Southern District of New York pursuant to 28 U.S.C § 1391 (a), (b), and (c) because claims arose within this district.

## PARTIES

6.      Plaintiff Debra Goodman is a resident of New York County, State of New York.

7.      Defendant City of New York ("City Defendant") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. City Defendant assumes the risks incidental to the

maintenance of a police force and the employment of police officers, as said risks attach to the public consumers of the services provided by the NYPD.

8.     New York City Police Officer Steven Rodriguez, shield no. 28141, is and was at all relevant times an officer, employee, and agent of the NYPD. On the date Ms. Goodman was arrested, he was assigned to the 20th Precinct. Police Officer Rodriguez is being sued in his individual and official capacity.

9.     Defendants John Doe and Richard Roe et al.; whose identities and number are presently unknown to Plaintiff, are and were at all relevant times officers, employees and/or agents of the NYPD.  They are sued in their official and individual capacities.

10.     At all times relevant herein, the Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all relevant times, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

## STATEMENT OF FACTS

### Arrest and Detention of Debra Goodman

11.     On September 25, 2013, Ms. Goodman was standing in the vicinity of Broadway and West 73rd Street, New York, NY, on a public sidewalk using her cell phone camera attempting to record police activity.

12.     EMS personnel were interacting with a woman in a wheelchair on the street who appeared to be homeless, and police officers were a distance up the block from them.

3

Ms. Goodman was standing approximately 30 feet away from the woman in the wheelchair and EMS personnel, and approximately 10 feet away from the NYPD officers. She was not obstructing or interfering with the police officers or EMS personnel.

13.    While attempting to record the events taking place, she was approached by a police officer who held up his camera and appeared to start recording her.

14.    Ms. Goodman told the officer that she had a right to record police activity, but the police did not have a right to record her.

15.    After a verbal exchange, the NYPD officer demanded to see Ms. Goodman's identification. When she stated that she had done nothing wrong, the officer grabbed her arms, cuffed her with her arms behind her back, and told her she was under arrest.

16.    She was arrested without reason or probable cause. Ms. Goodman did not resist being cuffed, nor did she resist the arrest. During Ms. Goodman's verbal exchange with the officer, no crowd had formed, though several pedestrians had stopped to watch. Upon information and belief, the NYPD officer's actions were motivated or substantially caused by Ms. Goodman's attempt to record the events.

17.    This arresting officer then threw her inside the police vehicle.

18.    While Ms. Goodman was sitting in the police van with her hands cuffed, the arresting officer and another officer pinned her to the seat by pushing her sideways.

19.    The assault on Ms. Goodman by Defendants was made without proper cause and in excess of the rightful authority of the NYPD officers.

20.    Upon information and belief, the arresting officer was Steven Rodriguez, shield #28141.

21.    Ms. Goodman was held in police custody for approximately 25 hours.

4

22.     During these hours, because Ms. Goodman had stated that she required her prescribed medication, NYPD members took Ms. Goodman to St. Luke's hospital and Bellevue. When she was taken to and from St. Luke's and Central Booking she had shackles around her ankles, and her hands were cuffed behind her back.

23.     As a result of having tissue removed in breast cancer surgery, the position of Ms. Goodman's arms and body when she was handcuffed caused her to experience severe muscle spasms and pain and suffering. Ms. Goodman told the NYPD members that the position in which she was cuffed caused her pain as a result of the surgery, but the officers did not remove the cuffs or cuff her in an alternate position that would eliminate or reduce the pain she was experiencing.

24.     Ms. Goodman appeared in court for the criminal case against her on November 25, 2013, January 21, 2014, March 4, 2014, April 8, 2014, and May 27, 2014.

25.     On May 27, 2014, the criminal prosecution was terminated favorably to Ms. Goodman when the New York County District Attorney's Office dismissed all the charges against her.

26.     Defendants' conduct caused Ms. Goodman to sustain physical pain, suffering, and injury and psychological and emotional trauma.  Their actions constituted outrageous and reckless conduct, and demonstrated a callous indifference to and willful disregard of Plaintiff's federal and state protected rights.

27.     As long as the NYPD policy, practice and custom of interfering with individuals' right to record police activity in public places continues, there is a likelihood that Ms. Goodman will be harmed in the future by this policy, practice and custom.  For over two years Ms. Goodman has regularly recorded NYPD members conducting their duties.   From the

5

time of her arrest until the time the charges were dismissed, Ms. Goodman   ceased recording the police because she was afraid she would be threatened, harassed and intimidated by the police and arrested without justification again.  She was particularly worried about being arrested again while the criminal charges against her were pending.  Nonetheless, in June of 2014, after the charges were dismissed, Ms. Goodman again began to record the NYPD officers, and will continue to record NYPD activity in the future, as she believes such recording and posting on social media helps to ensure the police remain accountable to the public and prevents police misconduct.  However, she will not record the police during night hours, as she would like, because she is concerned that she will again be arrested without justification.

28.     On December 18, 2013, a notice of claim was served on the Comptroller of the City of New York.  At least thirty days have elapsed since the service of such notice, and adjustment and/or payment has been neglected and/or refused.

29.     On June 9, 2014, a notice of claim for Plaintiff's malicious prosecution and related claims was served on the Comptroller of the City of New York.  At least thirty days have elapsed since the service of such notice, and adjustment and/or payment has been neglected and/or refused.

30.     A 50-h hearing was held on June 25, 2014.

### The NYPD's Policy, Practice and Custom of Not Respecting the Right of Individuals to Record Police Activity and its Failure to Train Its Officers to Respect this Right

31.     Small portable cameras, and in particular smartphones, which include integrated cameras capable of both still photography and audio and video recording, are widely used. According to the Pew Internet & American Life Project, as of September 2013, 91% of American adults have a cell phone and 55% of American adults have a smartphone.  Thus, a large portion of the public carries an audio and video recording devise with them at all times.

32.    Members of the public are using smartphones and small portable cameras to document police activity and hold police officers accountable for their conduct.  In the last few years, several highly publicized incidents of police abuse that have occurred were recorded by such cameras.

33.    For example, in 2008, a video recording made by a witness with a portable camera of an incident between NYPD Officer Patrick Pogan and a bicyclist, Christopher Long, led in part to officer Pogan's conviction for filing a criminal complaint containing false statements and his discharge from the NYPD.  The video showed Officer Pogan moving toward Mr. Long and violently shoving Mr. Long off his bicycle, contrary to Mr. Pogan's allegation that Mr. Long knocked him down by intentionally steering his bicycle into him. The incident and subsequent prosecution of Officer Pogan received publicity from both local and national news sources and has been viewed almost three million times on YouTube.

34.    In another high-profile incident, a portable camera captured NYPD Deputy Inspector Anthony Bologna using pepper spray on two women during an Occupy Wall Street protest in September 2011. The video received local and national media attention, and caused significant negative publicity for the NYPD.  Consequently, the NYPD disciplined Deputy Inspector Bologna, and the City declined to defend him in the civil lawsuit filed over the incident.

35.    Several other cities have faced lawsuits as a result of police interfering with individuals seeking to exercise their constitutional right to record police activity in public places.

36.    The City of Boston reached a settlement with an individual who was wrongfully arrested and prosecuted in retaliation for recording an arrest. The settlement was

reached after the United States Court of Appeals for the First Circuit held that there is a First Amendment right to record police officers performing their official duties. Also, subsequent to the First Circuit's decision, the Boston Police Department updated its training materials and policies to clearly state that members of the public have the right to record police officers.

37.     The City of Indianapolis also recently settled a lawsuit with an individual who claimed his First Amendment rights were violated when he was arrested after using his cell phone to record police officers arresting another man, and refused to voluntarily give the officers his cell phone. The settlement was reached after the Court refused to grant Defendants summary judgment on the <u>Monell</u> claim that the City had a practice or custom of seizing cell phones that contain video evidence of a crime. As part of the settlement the Indianapolis Police Department must institute a policy prohibiting police officers from interfering with civilians who are recording their actions.

38.     The City of Baltimore recently settled a lawsuit stemming from Baltimore Police Department officers' arrest and detention of a member of the public who used his cell phone camera to record an arrest. In the settlement the Baltimore Police Department agreed to adopt a new policy that recognizes individuals' right to record police officers, institute a training regimen on the new policy and on individuals' recording of police officers in general, and compensate the plaintiff and pay his legal fees. In this lawsuit, the Department of Justice filed a Statement of Interest, urging the Court to hold that private citizens have a First Amendment right to record police officers performing their official duties, and stating that the Baltimore Police Department should develop a comprehensive policy that specifically addresses this right. The DOJ's Statement of Interest further advocated that this policy should be implemented through periodic training, and the effectiveness of the training should be tested routinely. Moreover, the

8

DOJ also submitted a letter to counsel designed to assist the parties during their settlement conference. That letter, which is a public document posted on the Justice Department's website, reiterated that private individuals have a First Amendment right to record police activity and set forth six policies that police departments should follow to diminish the likelihood of constitutional violations.

39. In New Hampshire the Town of Weare also recently settled a lawsuit stemming from a plaintiff's arrest for attempting to record a traffic stop conducted by police officers. The town settled less than a month after the First Circuit had held that the plaintiff was exercising a clearly established First Amendment right, and, thus, affirmed the district court's denial of qualified immunity to the arresting officers.

40. The NYPD maintains a policy, practice and custom in which officers interfere with the rights of individuals who, without interfering with police activity, are recording or attempting to record officers performing their official duties in public. Such police interference includes arresting individuals who are recording and attempting to record police activity, threatening such individuals with arrest, and otherwise preventing or hindering such individuals' ability to record police activity. Examples include the following:

a. On February 15, 2014, at the Utica Avenue subway stop in Brooklyn, an NYPD member harassed and arrested Shawn Thomas for recording police activity and a member of the NYPD deleted Mr. Thomas's videos of the incident. More specifically, for over five minutes, from a distance of approximately 30 feet away, Mr. Thomas was using his small camera to record an NYPD member and a subject who had been detained. Mr. Thomas did not interact with the NYPD office or the subject. Then officer Rojas, shield no 23404, a second NYPD member, entered the subway station and noticed that

Mr. Thomas was recording.  Officer Rojas took out his own cell phone, walked the approximately 30 feet to Mr. Thomas, and stuck his phone inches away from Mr. Thomas's face.  After a tense conversation during which officer Rojas threatened to arrest Mr. Thomas, officer Rojas twisted Mr. Thomas's hand behind his back, so that Mr. Thomas could no longer record him, and, upon information and belief, turned off Mr. Thomas's camera.   After being walked out of the subway station, Mr. Thomas attempted to record officer Rojas with his blackberry, which he had in addition to his camera. Officer Rojas forcefully told Mr. Thomas to put the blackberry away.  Then officer Rojas threw Mr. Thomas to the ground, got on Mr., Thomas's back, slammed his head into the ground and subsequently arrested Mr. Thomas.  Mr. Thomas was in custody for approximately 23 hours.  When Mr. Thomas picked up his camera after he was released he noticed that the two videos of the incident were deleted from his camera.  Mr. Thomas however was able to recover the videos using a data recovery program. Mr. Thomas posted a video compromised predominantly of the recovered footage on YouTube.  The incident has been discussed in at least one New York newspaper and on blogs.

   b.  According to a lawsuit filed in the Eastern District of New York, on June 5, 2012 Hadiyah Charles was arrested for using her smartphone to record two NYPD officers as they questioned and frisked three young men.  On that day, in the Bedford-Stuyvesant neighborhood in Brooklyn, when Ms. Charles saw the officers questioning and frisking the men she approached them and asked what was happening.  One of the officers replied that it was "police business."  Subsequently, one of the officers asked Ms. Charles to step away from the scene. Ms. Charles complied with the request and stepped back and began recording the incident with her smartphone. Even though Ms. Charles

was already a reasonable distance away, one of the officers tried to stop her from recording by repeatedly asking her to step further away. At no time was Ms. Charles interfering with the police officers' actions. After recording for a short time one of the officers shoved Ms. Charles. Ms. Charles told the supervising officer that she wished to file a formal complaint. In response, Ms. Charles was handcuffed and placed in the police van. Ms. Charles filed a lawsuit on December 17, 2012 that includes a claim for violation of her First Amendment rights that is currently pending in the United States District Court for the Eastern District of New York. This incident has also been reported in at least one New York newspaper and on blogs.

        c.      On or about August 13, 2013 in Brooklyn Yosef Hershkop took a picture with his cell phone of a parked car that an NYPD member was ticketing. Mr. Hershkop was at least ten feet away from the officer and car. The officer aggressively waived her radio at Mr. Hershkop and told him to delete the picture in front of her. Fearing that he would be arrested, Mr. Hershkop complied with this order and deleted the picture.

        d.      Christina Gonzalez and Matthew Swaye have been arrested and threatened with arrest multiple times for recording police officers with their cell phones. For example, on or about May 16, 2013 Ms. Gonzalez and Mr. Swaye were on the 145th Street Bridge that connects Harlem and the Bronx. Both Ms. Gonzalez and Mr. Swaye were recording NYPD officers while they were performing a "vehicle safety check." Ms. Gonzalez asked the NYPD officers questions about what they were doing, which prompted an NYPD member to ask Ms. Gonzalez's to move away and ask for her identification. When she refused to give her identification an NYPD officer knocked the cell phone out of her hand and arrested her. The officers also threw Mr. Swaye to the

ground and took his phone.  Ms. Gonzalez and Mr. Swaye were in custody for

approximately 25 hours.  When Ms. Gonzalez picked up her phone after she was released

one of the memory cards in the phone was missing; however, it was not the memory card

that contained the video of the incident.  When Mr. Swaye picked up his phone after he

was released, the video of the incident was deleted from his phone.  Video footage of this

incident is posted on YouTube and the incident was covered on numerous blogs. In

addition, on or about July 31, 2012 on 146th and St Nicholas Avenue in Manhattan Ms.

Gonzalez was arrested by an NYPD officer for recording him.  However, Ms. Gonzalez

was released after his superior told him that Ms. Gonzalez was not violating any laws by

recording. Video footage of this incident is posted on YouTube.

      e.      On or about March 13, 2013 in the South Bronx Ed Garcia Conde, a

community activist, was arrested and given a summons for using his cell phone to record

an NYPD member questioning his friend.  Mr. Conde was with a group of volunteers

from the Bronx Documentary Center, a non-profit organization, when an NYPD sergeant

approached them. One member of the group was carrying a broken beer bottle to the

trash, sealed in a plastic bag and in a cup to capture the liquid from spilling, and the

sergeant accused them of having an open container of alcohol.  Mr. Conde began to

record the sergeant's questioning of another volunteer.  After approximately 15 seconds

of recording the sergeant told Mr. Conde to put the camera down.  Mr. Conde told the

sergeant it was his legal right to record, at which point the sergeant stormed towards Mr.

Conde, slammed him against a building, handcuffed him, and took him to the precinct.

Mr. Conde's video was posted on YouTube, and the incident was discussed on several

blogs.

     f.      On or about September 7, 2013 Diego Ibanez was in a subway station attempting to record NYPD members and two teenagers they were arresting.  Mr. Ibanez was at least 10 feet away from the officers and teenagers, and did not interfere or interact with the arrested teenagers or the NYPD.  Just after Mr. Ibanez started recording, NYPD members walked over to him, told him he couldn't stand where he was standing and that he had to go upstairs, out of the subway station.  Mr. Ibanez asserted that he had the right to record and that he would walk to another spot and record.  As he was walking away two NYPD officers came up to him from behind and cuffed him.  The NYPD members moved Mr. Ibanez next to the two arrested teenagers who he had been attempting to record. One officer said he would make Mr. Ibanez a deal such that if Mr. Ibanez erased the video he would not be sent to jail.  Mr. Ibanez agreed. Upon information and belief the officer attempted to erase the video, but he did not erase the video correctly; thus, Mr. Ibanez was able to subsequently post the video on his Facebook page.  While Mr. Ibanez was in custody, one of the officers said in words or effect, "This will teach you a lesson. The next time an officer tells you to stop filming what are you gonna do?" Mr. Ibanez responded that he will stop recording.  Mr. Ibanez received a Desk Appearance Ticket for disorderly conduct. This incident was discussed on at least one blog.

     g.      Upon information and belief, in May of 2013 an unidentified person was recording two NYPD members arresting an individual in a Harlem subway station.  The person was recording from a reasonable distance and was not interacting or interfering with the arrest.  While the two NYPD members were placing the handcuffs on the arrestee approximately two dozen NYPD members arrived in the subway station.  One of those NYPD members stopped the person from recording – he walked the person

recording out of the subway station repeatedly saying "come on lets go," while the person

recording repeatedly asked why he couldn't stand where he was. This incident was

discussed on at least one blog.

   41. Upon information and belief, these examples represent only a small

fraction of the total number of instances of NYPD members interfering with the rights of

individuals who, without interfering with police officers, are recording or attempting to record

police performing their official duties while in public.

   42. The NYPD has received numerous letters in recent years describing

attempts by NYPD officers to intimidate individuals seeking to document police activity. In a

letter to then Deputy Commissioner Paul Browne dated November 21, 2011, representatives of

The New York Times, The New York Post, The Daily News, the Associated Press and nine other

news organizations described numerous incidents in which NYPD officers assaulted and

detained members of the media and otherwise interfered with their ability to document Occupy

Wall Street demonstrations. The letter requested a meeting with Deputy Commissioner Browne

and then Commissioner Raymond Kelly to discuss the deteriorating relationship between the

NYPD and the media. The meeting occurred on November 23, 2011. In response to the meeting,

Commissioner Kelly merely issued a "FINEST message," reminding officers of their obligations

to cooperate with members of the media. Upon information or belief, neither Commissioner

Kelly nor any other NYPD official has initiated any further training. These news organizations

sent a follow up letter to Deputy Commissioner Browne on October 1, 2012 outlining additional

infringements on the rights of members of the news media to document police activity.  In

addition, The General Counsel of the National Press Photographer's Association (NPPA) sent a

letter to Deputy Commissioner Browne on August 16, 2012 regarding the unlawful arrest of

Robert Stolarik, a photographer for <u>The New York Times</u>. Police officers allegedly intimidated, assaulted, and then arrested Mr. Stolarik for taking pictures of an arrest that occurred in a public place in the Bronx.  Mr. Stolarik's arrest and detention received widespread media coverage, and the charges against him were subsequently dismissed.

        43.      NYPD Patrol Guide, Section 208-03, "Arrests - General Processing," dictates that "speech, ... taking photographs, videotapes or tape recordings ... [and] remaining in the vicinity of the stop or arrest" do not constitute probable cause for the arrest or detention of an onlooker unless the officers or others are directly endangered, or the law is otherwise violated. Despite this provision in the Patrol Guide, numerous NYPD officers have harassed, intimidated, assaulted, and arrested, threatened to arrest, and otherwise interfered with individuals who, without interfering with police activity, are attempting to record police activity. High-level NYPD officials, including the former and current Commissioners, are or should be aware of such repeated violations. Upon information and belief, the NYPD's policy, practice and custom of interfering with the rights of individuals attempting to record police activity violates the NYPD Patrol Guide.

        44.      Upon information and belief, there is a policy, practice and custom of NYPD officers employing cell phones to record individuals who are recording the police officers and not interfering with police activity, in violation of the individuals' First Amendment rights.

        45.      The violation of Ms. Goodman's rights was a direct result of the deficiency in the training and supervision of Officer Rodriguez and John Doe and Richard Roe. Among other deficiencies, they were insufficiently trained on how to respect the rights of individuals attempting to record police officers performing their official duties, as required by the NYPD Patrol Guide. Upon information and belief, the current training for NYPD officers

does not include sufficient training on the circumstances under which officers must allow people who observe police activity to record it. Further, upon information and belief, the current training for NYPD officers does not include sufficient training regarding when police officers may use their own or NYPD issued recording devices to record individuals who are recording them. The pattern of similar constitutional violations by untrained employees has or should have provided notice to policymaking officials.

46.     City Defendants' failure to train and supervise constitutes deliberate indifference to the constitutional rights of those with whom officers come into contact, including Plaintiff. Given the prevalence of smartphones and small portable cameras, the City Defendant and policymaking officials knew to a moral certainty that NYPD officers would come into contact with individuals attempting to record police activity in public places.  Further, the situation in which a member of the public records or attempts to record NYPD officers presents the officers with a difficult choice of the sort that training will make less difficult and City Defendant knew or should have known that there is a history of NYPD members mishandling the situation.  Further, the NYPD and City Defendant should have known that officers taking inappropriate actions in these situations would inevitably and frequently result in deprivations of individuals' constitutional rights.

47.     NYPD's policy, practice and custom of interfering with the rights of individuals who, without interfering with police activity, are recording or attempting to record police activity is so persistent, widespread and pervasive as to constitute a 'custom or usage' and imply the constructive knowledge or acquiescence of policymaking officials. The numerous instances of abuse, a small number of which are mentioned in paragraph 40 above, the fact that several incidents were discussed in newspapers and on blogs, and the high ranking NYPD

members who received letters complaining about these types of abuses demonstrates that the policymakers were aware, or at a minimum should have been aware, of their subordinates' unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions. This practice and custom of NYPD members violating the constitutional rights of individuals recording or attempting to record NYPD officers is so persistent, widespread, and pervasive and the need for corrective action is so obvious, that the supervising policymakers' failure to take action gives rise to an inference of their deliberate indifference, and their inaction constitutes a deliberate choice. Further, these policymaking officials' deliberate indifference to the constitutional deprivations caused by subordinates and their acquiescence may be properly thought of as a City policy, practice or custom.

48.     In taking the actions described above, the Defendants were acting under color of state law as aforesaid.

### FIRST CLAIM FOR RELIEF

### Violation of Plaintiff's First Amendment Rights

49.     Plaintiff repeats and realleges each and every allegation set forth above.

50.     Plaintiff has an interest protected by the First Amendment. Defendants Rodriguez and John Doe and Richard Roe's actions were motivated or substantially caused by Plaintiff's exercise of her First Amendment right and effectively chilled the exercise of this right.

51.     Defendants Rodriguez and John Doe and Richard Roe were at all relevant times agents, servants, and employees acting within the scope of their employment by the City of New York and the NYPD. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct.

52.     Plaintiff suffered injury and damages as a result of Defendants' conduct.

## SECOND CLAIM FOR RELIEF

### Municipal Liability

53. Plaintiff repeats and realleges each and every allegation set forth above.

54. There is a policy, practice and custom of NYPD officers failing to respect the First, Fourth and Fourteenth Amendment rights of individuals who, without interfering with police activity, are recording or attempting to record police officers performing their official duties in public.

55. City Defendant, by and through its policymakers and agents, condoned, permitted, encouraged and/or ratified NYPD policies, practices and/or customs that permitted NYPD officers to recklessly disregard the rights of individuals who were recording or attempting to record police officers performing their official duties in public.

56. City Defendant by and through its agents acted with deliberate indifference to the rights of individuals with whom their employees were known to come into contact, including Plaintiff.

57. The policies practices and/or customs served to ratify or tacitly authorize the unconstitutional actions of the employees and agents of City Defendant, caused Ms. Goodman to suffer constitutional violations, and were the moving force behind said deprivations.

58. City Defendant failed to train and supervise its officials, employees and agents, including Officer Rodriguez and John Doe and Richard Roe, regarding how to respect the rights of individuals attempting to record police officers performing their official duties so as to prevent the false arrest and false imprisonment of Plaintiff, which resulted in the violation of her rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

59. City Defendant's failure to train and supervise amounts to deliberate

18

indifference to the rights of persons with whom Defendants came into contact, including Plaintiff.

60.     Plaintiff suffered injury and damages as a result of the Defendants' conduct.

### THIRD CLAIM FOR RELIEF

#### Violation of Plaintiff's Fourth Amendment and Fourteenth Amendment Rights

61.     Plaintiff repeats and realleges each and every allegation set forth above.

62.     Defendants Rodriguez and John Doe and Richard Roe, who were acting in concert and within the scope of their authority, arrested and caused plaintiff to be imprisoned without probable cause in violation of Plaintiff's right to be free of an unreasonable seizure under the Fourth Amendment to the Constitution of the United States, and to be free of a deprivation of liberty under the Fourteenth Amendment to the Constitution of the United States.

63.     Defendants Rodriguez and John Doe and Richard Roe were at all relevant times agents, servants, and employees acting within the scope of their employment by the City of New York and the NYPD. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct.

64.     Plaintiff suffered injury and damages as a result of Defendants' conduct.

### FOURTH CLAIM FOR RELIEF

#### Violation of Plaintiff's Fourth Amendment Right

65.     Plaintiff repeats and realleges each and every allegation set forth above.

66.     The use of excessive force by Defendants Rodriguez and John Doe and Richard Roe was an objectively unreasonable physical seizure of plaintiff in violation of her rights under the Fourth Amendment to the Constitution of the United States.

19

67.     Defendants Rodriguez and John Doe and Richard Roe were at all relevant times agents, servants, and employees acting within the scope of their employment by the City of New York and the NYPD. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct.

68.     Plaintiff suffered injury and damages as a result of Defendants' conduct.

## FIFTH CLAIM FOR RELIEF

### Assault

69.     Plaintiff repeats and realleges each and every allegation set forth above.

70.     Defendants Rodriguez and John Doe and Richard Roe acting within the scope of their employment, intentionally, willfully and maliciously assaulted Plaintiff in that they had the real or apparent ability to cause imminent harmful and/or offensive bodily contact, and intentionally engaged in a violent and/or overt menacing act, which threatened such contact to the plaintiff, and that such act(s) caused reasonable apprehension of such contact in the plaintiff.

71.     Defendants Rodriguez and John Doe and Richard Roe were at all relevant times agents, servants, and employees acting within the scope of their employment by the City of New York and the NYPD. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct.

72.     Plaintiff suffered injury and damages as a result of Defendants' conduct.

73.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## SIXTH CLAIM FOR RELIEF

### Battery

74.     Plaintiff repeats and realleges each and every allegation set forth above.

75.     Defendants Rodriguez and John Doe and Richard Roe, acting within the scope of their employment, intentionally, willfully, and maliciously battered Plaintiff when they, in a hostile and/or offensive manner struck plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the plaintiff and caused such battery.

76.     Defendants Rodriguez and John Doe and Richard Roe were at all relevant times agents, servants, and employees acting within the scope of their employment by the City of New York and the NYPD. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct.

77.     Plaintiff suffered injury and damages as a result of Defendants' conduct.

78.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## SEVENTH CLAIM FOR RELIEF

### False Arrest and False Imprisonment

79.     Plaintiff repeats and realleges each and every allegation set forth above.

80.     The acts and conduct of Defendants Rodriguez and John Doe and Richard Roe constitute false arrest and false imprisonment under the laws of the State of New York. Defendants intended to confine Plaintiff, and, in fact, confined Plaintiff, and Plaintiff was conscious of the confinement. Moreover, Plaintiff did not consent to the confinement and the confinement was not otherwise privileged.

81.     Defendants Rodriguez and John Doe and Richard Roe were at all relevant times agents, servants, and employees acting within the scope of their employment by the City of New York and the NYPD. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct.

82.     Plaintiff suffered injury and damages as a result of Defendants' conducts.

83.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## EIGHTH CLAIM FOR RELIEF

### Malicious Prosecution

84.     Plaintiff repeats and realleges each and every allegation set forth above.

85.     The acts and conduct of the defendants constitute malicious prosecution under the laws of the State of New York and under the Fourth Amendment to the Constitution of the United States. Defendants commenced and continued a criminal proceeding against Plaintiff. Defendants acted with actual malice in commencing and continuing the proceeding and there was an absence of probable cause for the criminal proceeding. Furthermore, the criminal proceeding was terminated favorably to Plaintiff.

86.     Defendants were at all relevant times agents, servants and employees acting within the scope of their employment by the City of New York. The City of New York and the NYPD are responsible for Defendants Rodriguez and John Doe and Richard Roe's conduct..

87.     Plaintiff suffered injury and damages as a result of Defendants' conduct.

88.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental or pendant jurisdiction to hear and adjudicate such claims.

## NINTH CLAIM FOR RELIEF

### Negligent Hiring, Retention, Training and Supervision (State Law)

89.     Plaintiff repeats and realleges each and every allegation set forth above.

90.     Defendant The City of New York and its employees, servants and/or

agents acting within the scope of their employment did negligently hire, retain, train and supervise Defendants Rodriguez and John Doe and Richard Roe, individuals who were unfit for the performance of police duties on September 25, 2013, at the aforementioned location.

91.     Plaintiff suffered injury and damages as a result of the Defendants' conduct.

92.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## TENTH CLAIM FOR RELIEF

### Violation of Article I, Section 8 of the New York Constitution

93.     Plaintiff repeats and realleges each and every allegation set forth above.

94.     Defendants violated Plaintiff's rights under Article I, Section 8 of the New York Constitution.

95.     Plaintiff suffered injury and damages as a result of the Defendants' conduct.

## JURY DEMAND

96.     Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.     A declaratory judgment that Defendants violated the Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983, and Article I, Sections 8 of the New York State Constitution, and violated the laws of the State of New York, and that Ms. Goodman's attempted recording was an act of

speech protected by the First and Fourteenth Amendments to the United States Constitution, and Article I, Section 8 of the New York Constitution.

      B.     A permanent injunction preventing the City of New York and its employees from retaliating against or otherwise punishing Plaintiff or anyone who, without interfering with police activity, records or attempts to record police officers performing official duties in public.

      C.     That the jury find and the Court adjudge and decree that plaintiff Debra Goodman shall recover compensatory damages in an amount to be determined at trial against the individual defendants and the City of New York, jointly and severally, together with interests and costs, and punitive damages in an amount to be determined at trial against the individual defendants, jointly and severally.

      D.     That the plaintiff recover the cost of this suit, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

      E.     That the Plaintiff have such other and further relief as the Court shall deem just and proper.

Dated:        July 14, 2014
                 New York, New York

                          SIEGEL TEITELBAUM & EVANS, LLP

                          By: _Norman Siegel_
                                   Norman Siegel

                          By: _____
                                   Herbert Teitelbaum
                                   Sharon Sprayregen
                              260 Madison Avenue, 22nd Floor
                                 New York, NY 10016
                                   (212) 455-0300

EMERY CELLI BRINCKERHOFF & ABADY LLP

By: _Earl Ward_ by NS

Earl Ward
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5070
eward@ecbalaw.com

ATTORNEYS FOR PLAINTIFF